IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESTATE of D. QUANTAZE CAMPBELL, by
Quanise McClaim, Special Administrator,

                 Plaintiff,                           OPINION and ORDER

   v.

                                                          25-cv-105-wmc

CODY WOODS and DANE COUNTY,

                 Defendants.

---

While patrolling the Village of Windsor, Wisconsin in October 2022, Dane County Sheriff's Deputy Cody Woods spotted a truck in a Super 8 parking lot that had been reported stolen. Quantaze Campbell was in the driver's seat, and two other passengers were in the vehicle. What happened next was a series of tragic choices that led to Campbell's death. When Deputy Woods pulled his squad car up and at an angle to the front of the truck, Campbell started the stolen truck's engine and began driving forward. Woods then immediately exited his squad car and ordered Campbell to stop, turn off the engine and remain inside. Although Campbell complied initially, after a couple more minutes of Woods excitedly yelling, arguably inconsistent orders (e.g., "hands up," "put the car in park," and "stay put") while moving in front of his squad car, then directly in front (and at times to the side) of the stolen vehicle with his service revolver trained on Campbell, Campbell began to pull forward, stopped for his front seat passenger to exit with her hands up between the truck and an adjacent car, then turned his wheels away from Deputy Woods and began to pull out. In the split seconds that followed, Woods reacted by shooting once through the driver's side window, killing Campbell.

Campbell's estate subsequently filed this lawsuit against Deputy Woods and Dane County, contending that: Woods violated Campbell's Fourteenth Amendment due process rights by escalating a dangerous situation and Fourth Amendment rights by shooting him; the County had failed to train and supervise Woods properly; and both defendants are liable for a wrongful death under Wisconsin state law. Defendants Woods and the County have moved for summary judgment on all of these claims. (Dkt. #38.)[1] In response, the estate subsequently conceded that it cannot succeed on a *Monell* claim against the County or on its "state-created-danger" due process claim against Woods, so those claims will be dismissed. (Dkt. #50, at 26.) While the estate did not expressly concede that its state-law failure to train and supervise claim against the County should be dismissed, it also presented no evidence or argument: identifying any specific deficiency in the County's policies and training; offering alternative policies or training programs that the County should have adopted instead; or explaining how different policies or training would have prevented the harm to Campbell. Thus, the estate's state-law failure to train and supervise claim will be dismissed as well.

The estate's remaining Fourth Amendment claim presents a much closer question, particularly because Woods asserts a qualified immunity defense. Ultimately, even with the aid of a dash cam and other video footage, genuine disputes of material fact prevent summary judgment. Specifically, to assess Woods' entitlement to qualified immunity, the claim must proceed trial against Deputy Woods for fuller factual development regarding the positions of

---

[1] Plaintiff also named "John Does 1–5" and ABC Insurance Company as placeholder defendants in the original complaint but never identified any of the Doe defendants or an insurance company. Those defendants have now been removed from the caption.

the deputy and passenger from the viewpoint of an objective police officer at the time the stolen truck appears to pull away.

## UNDISPUTED FACTS[2]

On October 13, 2022, Dane County Sheriff's Deputy Cody Woods was patrolling alone in the Village of Windsor, located approximately 13 miles from the City of Madison and roughly 15 miles from the Dane County Sheriff's Office.  Woods was the sole sheriff's deputy assigned to the Village that day.  At around 6:00 p.m., he received an alert on his Mobile Data Computer (MDC) indicating that a black Ford F-150 previously reported as stolen had been detected traveling northbound on Lake Road.  The alert included a photograph and general description of the stolen vehicle, the license plate number, and the date, time, and location where detected.

Deputy Woods attempted to locate the F-150, by first following a truck on Lake Road that roughly matched the description, but then abandoning that pursuit after determining that the vehicle's license plate did not match that of the reportedly stolen F-150.  Woods next proceeded to the area where cameras had detected the stolen truck, eventually turning into the parking lot of a nearby Super 8 motel where he spotted a black Ford F-150 parked in a stall. At that point, Deputy Woods paused his squad car near the F-150 for a few seconds to confirm that the license plate matched the reported plate, then moved his squad car closer and angled toward the front of the truck while activating his emergency lights and advising dispatch that

---

[2] Unless otherwise indicated, the following facts are undisputed and drawn from the parties' proposed findings of facts and responses, video and audio footage from Woods' squad car, and video from the Super 8 motel's and a nearby fast-food restaurant's security cameras.

he had located the stolen vehicle.  Dispatch responded that backup would be sent, although given his location in Dane County, Woods believed it would be several minutes before backup arrived.  Woods also knew that approaching a stolen vehicle was "high risk," because stolen vehicles are frequently associated with weapons being inside the vehicle.  Even so, Woods decided to approach the truck on his own.

The following incident was captured both on Woods' squad car camera and security footage from a Super 8 and nearby fast-food restaurant, although some of that footage is dark and grainy.  Still, the squad car footage clearly captures Deputy Woods exiting his police squad, drawing his firearm, and yelling, "Stay in the car!"  At the time, Woods could also see three occupants moving inside the F-150: a man (Campbell) in the driver's seat; a woman in the front-seat, passenger-side; and a woman in the rear-seat, also on the passenger side.  After Woods directed the occupants to stay in the car, the F-150 began to pull forward, out of the parking stall, prompting the deputy to shout "Stop, Stop the Car," as he approached the F-150 with his weapon still drawn and pointing at the truck.  Woods then ordered Campbell three times to "Put the car in park," which apparently prompted Campbell to make visual contact, raise his hands and slowly back the truck back into the parking stall.  As Campbell then appears to have stopped and began to open his driver-side door, Deputy Woods -- now positioned near the front of the F-150 --ordered him to "Turn off the car!"  However, as Campbell began to exit the truck, Woods moved toward the driver's side, near the front driver-side headlight and the wheel of the F-150, while ordering Campbell to "Stop, Stop right there, put the car in park!"  Campbell then returned to the driver's seat with his door still open and appeared to say something to Deputy Woods that is inaudible on the video recordings.

The front, passenger-side door then opened, and a woman exited the truck. In response, Deputy Woods moved toward the front of the F-150 and ordered that passenger to "Stay in the car!" Unfortunately, she disregarded his order just as Campbell again attempted to exit the truck from the driver's seat -- partially lifting his body out while looking rearward over his left shoulder -- prompting Woods to move toward the driver's side near the front tire of the F-150, make eye contact with and again train his gun on Campbell. Just as Woods moved toward the driver's side of the vehicle, Campbell jumped into the driver's seat, turned the wheel away from Deputy Woods and pulled out of the parking stall with the driver-side door still open. (Dash Cam Video 1:19–1:24; Super 8 Video 31:19–31:21; A&W Video 15:25–28.) While difficult to tell from the video footage where Woods was actually standing when the truck starts forward, in the few seconds both before and after the acceleration, Woods appears to move toward the passenger side of the truck and then, when the truck started moving, Woods side-stepped next to the truck, moving toward the front, though not directly in front of it. It is also unclear if Woods could see where the exited passenger moved, though she seems to have retreated. Regardless, in the split second as the truck accelerated forward, Woods managed to avoid the truck and fired a single shot through the driver-side window, striking Campbell in the stomach and killing him.

## OPINION

The estate asserts that the following claims should survive summary judgment: (1) Woods used excessive force by shooting Campbell in violation of the Fourth Amendment; (2) Woods and the County are liable for a wrongful death under Wisconsin common law. Defendants move for summary judgment on each of those claims. On a motion for summary

judgment, the question is whether any genuine factual disputes could make a difference to the outcome of the case or, stated another way, whether a reasonable jury could find for the nonmoving party after drawing all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

### I.  Fourth Amendment

#### A.  Reasonableness of Seizures

The use of force against a suspect may constitute a "seizure" subject to the reasonableness requirement of the Fourth Amendment.  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Determining whether the *amount* of force used to effect a seizure was reasonable requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The answer to that question requires considering:  the severity of the suspected crime; whether the suspect posed an immediate threat to the officer's or others' safety; and whether the suspect was resisting arrest or fleeing.  *Id.*; *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015).  In particular, "[d]eadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape."  *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025) (quoting *Garner*, 471 U.S. at 11–12).  Thus, "when an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense" because, at that point, "the risk of serious physical harm to the officer or others

has been established." *Scott v. Edinburg*, 346 F.3d 752, 756 n.2, 757 (7th Cir. 2003). Perhaps most relevant here, an automobile may be used as a deadly weapon; thus, an officer may justifiably use deadly force when a suspect accelerates toward him or others with an automobile, just as reckless driving or possession of a weapon may pose an ongoing threat to the public. *See Plumhoff v. Rickard*, 572 U.S. 765, 768, 776–77 (2014) (holding that police acted reasonably in shooting driver at the end of a "dangerous car chase" lasting more than five minutes, at least where driver was "intent on resuming his flight" despite crashing into multiple police cruisers because, if allowed to do so, he would "again pose a deadly threat for others"); *Manery v. Lee*, 124 F.4th 1073, 1082 (7th Cir. 2025) (police officer did not violate clearly established Fourth Amendment law by shooting driver who had hit two police vehicles, had not clearly surrendered, and whom dispatch advised was wanted for aggravated assault with a vehicle, might be armed and might attempt "suicide by cop"); *Tousis v. Billiot,* 84 F.4th 692, 698, 701–02 (7th Cir. 2023) (DEA agent standing in front of stopped vehicle following a high-speed chase did not violate clearly established Fourth Amendment law by shooting driver when the driver began moving vehicle forward, toward officer).

Still, a justification for using deadly force may be temporally limited: even "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993); *see also Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."). Thus, an officer may not shoot at the operator of a vehicle who presents no risk of *imminent* harm to the officer or others. *See Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018) ("It is firmly established that a person has a right not to be seized through the use of deadly force unless he puts another

person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force."); *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (individuals "have a right not to be shot unless they are perceived as posing a threat to officers or others"); *Sterusky v. Cooper*, No. 24-5820, 2025 WL 2058797, at *5 (6th Cir. July 23, 2025) ("If [plaintiff] was trying to flee in his car and was not threatening [officer], [officer's] use of deadly force" was "unreasonable").

For example, in *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003), an off-duty police officer stepped away from his car after stopping at a gas station. *Id*. at 754. In his absence, a man attempted to steal his car. After being alerted to the car theft, the officer ran back to his car, yelling "stop." *Id.* Hearing this, the suspect first reversed the car towards the officer, causing the officer to move away and draw his weapon. *Id.* When the suspect then started to drive forward in the direction of several bystanders, as well as the main roadway, the officer fired his gun at the suspect, killing him. *Id*. The officer argued that the shooting was justified because the suspect had threatened him with a deadly weapon by trying to back over him with the vehicle. *Id.* at 757. However, the parties in that case disputed whether the officer fired his first shot while the vehicle was backing up toward the officer or after it had started to pull away. *Id.* The Seventh Circuit held that because there was a "genuine issue of material fact as to the timing of the first shot," *summary judgment* on a self-defense justification for using deadly force was inappropriate. *Id.* at 757–58 ("If the fatal shot was fired while [the suspect] was driving away, then the argument that [the officer] was compelled to fire in order to protect himself would be significantly weakened.") Even so, the court went on to hold that, assuming the vehicle was moving forward, use of force was reasonable in light of the immediate threat to bystanders. *Id.* at 759.

Similarly, in *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), the Seventh Circuit emphasized the officers approached a suspect in a stolen vehicle sitting in a parking lot from three sides. *Id*. at 232. Attempting to flee, the suspect put the car into reverse, hitting a police car that was blocking his path. *Id.* He then drove forward, at which point three officers opened fire. At some point, one of the officers had jumped in front of the car, but there was a dispute about whether the officer did so before or after the car started moving forward. The Seventh Circuit held that if the officer "unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him," then his use of force was unreasonable. *Id.* at 234. On the other hand, if the officer "was in the path of the car before the car started forward," use of deadly force to protect the officer would have been reasonable. Because the timing was disputed, the court dismissed the qualified immunity appeal for lack of jurisdiction. *Id.* at 232–33, 35.

The ultimate question in assessing reasonableness is "whether the totality of the circumstances justified a particular sort of ... seizure." *Garner*, 471 U.S. at 8–9. In answering this question, courts consider the "totality of the circumstances" from the "perspective of a reasonable officer on the scene," without the benefit of hindsight. *Id.* (quoting *Graham*, 490 U.S. at 396.) Courts must consider "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (citations omitted). "[Courts] must [also] remember that field encounters often require law enforcement officers to make split-second decisions in quickly unfolding, highly stressful situations." *Manery*, 124 F.4th at 1079.

### B.  Defendant's Use of Deadly Force

Applying these legal principles, the question for the court is whether a reasonable jury could find that a reasonable officer with defendant's knowledge lacked probable cause to believe that Campbell posed an immediate threat to the safety of himself and of others in the moments leading up to and during deployment of deadly force.  *See Pam v. City of Evansville*, 154 F.4th 523, 531–32 (7th Cir. 2025) (to use deadly force, officer must have "probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape.")  In making this determination, the court must acknowledge the information defendant possessed, as well as the uncertainties that defendant faced, both before and during the time he discharged his firearm. *See Barnes v. Felix*, 605 U.S. 73, 79 (2025); *Smith v. Finkley*, 10 F.4th 725, 739 (7th Cir. 2021) ("[T]he totality of the circumstances to justify a seizure includes the period just before and during the shooting.").

Plaintiff and defendant point to different pieces of evidence to support their position about whether an objective officer would have probable cause to believe that Campbell posed an immediate threat to the safety of himself or others.  As the estate points out, although defendant knew that Campbell and two other passengers were sitting in a truck that had been reported stolen, there were *no* reports of weapons, aggressive or reckless driving, or threats toward defendant or others.  There were also only a few pedestrian bystanders in the Super 8 parking lot at the time Deputy Woods approached the truck, reducing the risk of injury to others, and back-up was on the way.  Finally, plaintiff argues that Woods shot Campbell through the passenger side door, as Campbell was driving away from, not toward, defendant.

10

From these facts, plaintiff contends a reasonable jury could find Campbell was a nonviolent felon who was shot for attempting to flee the scene, in violation of the Fourth Amendment.

On the other hand, defendant points to several *different* facts that he says support a finding of reasonableness. First, he states that approaching stolen vehicles is considered "high-risk," due to potential weapons in the vehicle. Second, one of the passengers had exited the vehicle and was ignoring defendant's orders to return to it, creating a risk that she could be injured or even a further threat. Third, shortly before defendant used his firearm, Campbell accelerated the truck forward, causing defendant to fear for his safety or others, and forcing him to make a split-second decision in a high-stress environment.

Unfortunately, the video footage does *not* resolve the parties' key factual disputes regarding the circumstances just before and during the shooting. Specifically, defendant says that when he made the decision to open fire, Campbell had "rapidly accelerated toward" him with the "pedal to the metal," therefore justifying the use of deadly force to protect himself and the passenger who had exited the vehicle. (Dft.'s Br. (dkt. #45) 7–8, 15.) Defendant Woods maintains that the video footage confirms both that the truck was accelerating quickly toward him and that he was in imminent danger, but the video footage contradicts, or at least puts into question, defendant's account. From the court's own review of the footage, it appears that Campbell began pulling out of the parking spot after defendant had moved away from the front of the truck, and that neither defendant nor the woman who had exited the truck (nor any other person) was at risk of being hit. Further, the video does not capture clearly the moment that defendant discharged his weapon. Instead, defendant appears to be running alongside the truck when he fires his gun, contrary to his statement that he shot toward the truck to prevent himself from being hit.

11

Even so, defendant correctly points out that the court cannot rely on hindsight, as this was a rapidly evolving encounter during which he had been forced to make split-second decisions. Certainly, the Seventh Circuit has cautioned courts against relying too heavily on "the benefit of security footage" to parse events at such fraught moments. *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 989 (7th Cir. 2021). Instead, courts must consider events "in light of how quickly – and in precisely what circumstances – everything transpired." *Id.* However, in this case, key facts are disputed, including the truck's speed and direction, defendant's location in relation to Campbell when he fired his weapon, and his knowledge as to the position of the departed passenger and potentially other. Moreover, the court has an obligation to consider the evidence presented by both sides, drawing reasonable inferences in favor of plaintiff, at this point the nonmoving party. *See Strand*, 910 F.3d at 915 (at summary judgment, facts must be viewed in nonmoving party's favor).

Here, a reasonable juror *could* find that, rather than the truck driving toward defendant or anyone else, the truck was accelerating away, and defendant fired his weapon into the driver's side of the truck despite being objectively out of harm's way. At the very least, given the uncertainty presented by the video footage and other, conflicting evidence, there are genuine disputes of material fact as to whether an objective officer would have used deadly force in response to the threat Campbell posed. If a reasonable jury disbelieved defendant's version of events in particular, they could conclude that the totality of the circumstances did not warrant the use of deadly force against Campbell. *Smith v. Finkley*, 10 F.4th 725, 740 (7th Cir. 2021) (Where parties dispute whether the suspect was resisting and presented an immediate threat to the defendant officers and "[t]he officers' videos do not blatantly contradict or corroborate the version of events for one side or the other," there was an

unresolved factual dispute that precluded summary judgment.); *Kailin v. Vill. Of Gurnee*, 77 F.3d 476, 481 (7th Cir. 2023) ("Video evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts.").

### C. Qualified Immunity

As for Deputy Woods assertion of qualified immunity, this defense in intended to shield "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, qualified immunity protects public officials "from undue interference with their duties and from potentially disabling threats of liability." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2026) (quoting *Harlow*, 457 U.S. at 806). In addition, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

A public official will be protected by qualified immunity "unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (quoting *al-Kidd*, 563 U.S. at 735). As discussed above, a factual dispute precludes resolution of the first inquiry, so the court moves directly to the "clearly established" prong.

13

In the context of excessive force claims, a plaintiff can meet "this burden [of proving that defendant violated a clearly established right] either by identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on him' or by showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citation omitted).  Although a plaintiff need not put forth "a case directly on point," settled authority "must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Further, the constitutional right at issue must not be defined at too high a level of generality, *Plumhoff*, 572 U.S. at 779, particularly in the Fourth Amendment context as it "is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  That said, the "clearly established" assessment "does not require a case with identical factual circumstances, lest qualified immunity become absolute immunity." *Lopez*, 993 F.3d at 987 (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

As discussed above, the Seventh Circuit has on several occasions considered an officer's use of deadly force on a suspect operating a moving vehicle. *E.g., Manery*, 124 F.4th 1073; *Tousis,* 84 F.4th 692; *Starks*, 5 F.3d 230; *Scott,* 346 F.3d 752.  In these cases, the Seventh Circuit held that an officer may use deadly force on the operator of a vehicle only if the officer reasonably believes that the operator or vehicle poses an imminent threat of serious harm. *Manery*, 124 F.4th at 1081–82; *Tousis,* 84 F.4th at 698; *Scott,* 346 F.3d at 757–58; *Starks*, 5 F.3d at 234.  Plaintiff argues that the facts of this case are closer to those in *Scott* and *Starks*, while defendant argues *Manery* and *Tousis* clearly control.  In fact, particularly if viewed in

14

plaintiff's favor as the court must at summary judgment, the facts here fall somewhere in the middle of these cases.

Perhaps most importantly, as in *Manery* and *Tousis*, Deputy Woods was suddenly faced with a deadly weapon in the form of a truck moving forward, in close proximity to an exited passenger and himself, with little room to maneuver and uncertainty whether the truck could suddenly swerve toward them. *Manery*, 124 F.4th at 1080 (officers' must have 'breathing room to make reasonable, but mistaken judgments, about open legal questions'"); *Tousis*, 84 F.4th at 698-99 ("a reasonable officer who would be in fear of being hit by the moving vehicle" if "in a very small space even if a car [were] maneuvering away from the officer"). However, in granting qualified immunity to the officers in both cases, the Seventh Circuit emphasized much greater indices of danger from the driver. In *Tousis*, the driver had already "fled law enforcement once, only minutes earlier, at reckless speeds," exceeding 100 miles per hour, "weaving in and out of traffic, endangering the lives of officers in pursuit and members of the public with whom he shared the road." 84 F.4th at 699. Similarly, in *Manery*, the officer had already been informed that Manery "might be armed" and had "previously threatened 'suicide by cop.'" *Id.* at 1076. Moreover, he had just driven into two, other deputies' squad cars within seconds of the officer's decision to shoot. *Id*. at 1077. In this sense, the facts are much closer to *Starks*, where the Seventh Circuit declined to grant qualified immunity without a full trial despite officers confronting a suspect in a stolen vehicle who had already hit a police car before an officer jumped in front of the car and began shooting. 5 F.3d at 232–35. While the court agrees that there is less reason to question Deputy Woods' actions in creating a dangerous situation than in *Starks*, so, too, there is substantially less reason for him to have feared Campbell's intent to harm anyone.

15

Thus, for the same reasons the court cannot resolve whether there was a Fourth Amendment violation, this court cannot resolve defendant's qualified immunity defense on the record before it. Specifically, there are disputed facts regarding whether a reasonable officer in defendant's position would have believed that Campbell posed an imminent threat of harm to defendant or others at the time Deputy Woods deployed his firearm, particularly having arguably shown no intent to harm anyone and repeatedly attempting to move safely past Deputy Woods. Moreover, in deciding qualified immunity at summary judgment, the court must still view the evidence in the light most favorable to the plaintiff and ask whether a reasonable jury could find that the defendant violated the plaintiff's clearly established rights. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). As already explained, viewing the video footage in Campbell's favor, a jury could reasonably find that no objective officer would have believed deadly force was justified under the totality of the circumstances.

Ultimately, this court may well find that the case law remains uncertain whether an officer can use deadly force on a possibly armed car thief trying to get away, but it would be far more comfortable doing so on a complete record as to what kind of threat Campbell actually presented. Given the factual disputes, the court will await a fuller development of the record at trial before determining whether Woods violated clearly established law. *See Steinhoff v. Malovrh*, 170 F.4th 647, 649 (7th Cir. 2026) (summary judgment on qualified immunity improper where plaintiff's encounter with law enforcement was only a "matter of seconds" and body-camera footage showing the incident was too "dark, grainy, at times obscured, and d[id] not clearly depict" the incident); *Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 343 (6th Cir. 2016) (genuine issue of material fact existed as to whether police officer's actions in shooting

16

driver were objectively reasonable under the circumstances, precluding summary judgment on issue of qualified immunity).[3]

## II.     Wrongful Death Under Wisconsin Law

Finally, plaintiff brings a wrongful death claim against both Woods and Dane County. However, the court agrees with defendants that both claims are barred by Wisconsin's immunity statute, Wis. Stat. § 893.80, because the conduct at issue involved a discretionary law enforcement judgment. *See Sheridan v. City of Janesville*, 164 Wis. 2d 420, 428, 474 N.W.2d 799, 802 (Ct. App. 1991) (police officer's decisions whether to arrest, handcuff, give a breathalyzer, or use force were discretionary acts entitled to immunity under §893.80).  Nor has plaintiff identified any recognized exception to immunity that would apply under the circumstances.  Accordingly, summary judgment will be granted to defendants on the estate's wrongful death claim.

## ORDER

IT IS ORDERED that defendants' motions for summary judgment (dkt. #38), GRANTED IN PART and DENIED IN PART.  The motion is GRANTED with respect to all plaintiff's claims against defendant Dane County, and its claims against defendant Cody

---

[3] One piece of evidence missing from that the record that would seem to be particularly helpful in assessing the totality of the circumstances is a statement from either of the two, eyewitness passengers, but neither party provided accounts from either individual with their summary judgment filings.

Woods under the Fourteenth Amendment and state law.  The motion is DENIED with respect to plaintiff's Fourth Amendment claim against defendant Woods alone.

Entered 1st day of June, 2026.

<div style="margin-left: 45%;">

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

</div>